IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JENNIFER L. G.,[1] | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil No. 19-cv-545-DGW[2] |
| | ) |
| COMMISSIONER OF SOCIAL SECURITY, | ) |
| | ) |
| Defendant. | ) |

## **MEMORANDUM and ORDER**

**WILKERSON, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) Benefits pursuant to 42 U.S.C. § 423.

## **Procedural History**

Plaintiff applied for DIB and SSI in April 2016, alleging a disability onset date of March 16, 2016. After holding an evidentiary hearing, an ALJ denied the application on August 15, 2018. (Tr. 13-22). The Appeals Council denied plaintiff's request for review, making the ALJ's decision the final agency decision subject to judicial review. (Tr. 1). Plaintiff exhausted administrative remedies and filed a timely complaint with this Court.

---

[1] Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. See, Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c). See, Doc. 11.

1

## Issues Raised by Plaintiff

Plaintiff raises the following issues:

1. The ALJ failed to discuss relevant medical evidence in assessing her RFC.

2. The ALJ failed to consider whether she was entitled to a closed period of disability.

2. The ALJ relied on outdated medical opinions from state agency consultants.

## Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[3] Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a plaintiff is disabled, the ALJ considers the following five questions in order: (1) Is the plaintiff presently unemployed? (2) Does the plaintiff have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the plaintiff unable to perform her former occupation? and (5) Is the plaintiff unable to

---

[3] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

perform any other work?   20 C.F.R. § 404.1520.

An affirmative answer at either step 3 or step 5 leads to a finding that the plaintiff is disabled.   A negative answer at any step, other than at step 3, precludes a finding of disability.   The plaintiff bears the burden of proof at steps 1–4.   Once the plaintiff shows an inability to perform past work, the burden then shifts to the Commissioner to show the plaintiff's ability to engage in other work existing in significant numbers in the national economy.   *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

It is important to recognize that the scope of judicial review is limited.   "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g).   Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.   *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).   The Supreme Court defines substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."   *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.   *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019).   However, while judicial review is deferential, it is not abject; this Court does not act as a

3

rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## The Decision of the ALJ

The ALJ followed the five-step analytical framework described above. He determined that plaintiff had worked after the alleged onset date, but not at the level of substantial gainful activity. She is insured for DIB through September 30, 2021. The ALJ found that plaintiff had severe impairments of residuals of pelvic fractures with status post-surgical open reduction and internal fixation; COPD; asthma; diabetes; and obesity.

The ALJ found that plaintiff had the RFC to do light work limited to frequent pushing or pulling with right lower extremity; occasional stooping, kneeling, crouching, crawling, and climbing of ladders, ropes, or scaffolds; and no exposure to pulmonary irritants.

Based on the testimony of a vocational expert, the ALJ found that plaintiff was able to do her past relevant work as a cashier (gas station) and cashier (checker) as those jobs are generally performed.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

1. **Agency Forms**

Plaintiff was born in 1978 and was 40 years old on the date of the ALJ's decision. (Tr. 207). She was 5' 3" tall and weighed 245 pounds. She said she

stopped working on March 16, 2016, because of her condition. (Tr. 210).

In August 2016, plaintiff reported that she could not work because she could not stand for long period, had trouble bending and crouching, and could not lift as much weight as she used to because she used a cane. (Tr. 226).

Plaintiff had worked as a cashier at a gas station and in a Cracker Barrel restaurant. (Tr. 276).

### 2. Evidentiary Hearing

Plaintiff was represented by an attorney at the hearing in May 2018. (Tr. 30).

Plaintiff was in an accident with an 18-wheeler on the alleged date of onset. Her pelvis was broken in two places. (Tr. 36). She testified that she could sit for 2 to 3 hours and stand for about 4. She said she could not work because the only job she ever had was as a cashier, and that job requires standing for 8 hours. The ALJ asked if she could do the job if she were permitted to sit on a stool. She testified that she could if she "could get up and stand and it didn't involve any bending." She was taking a "low grade muscle relaxer." She lived with her sister. She did light housework in the morning and then laid down for 2 hours. Then she usually got up and talked to her sister. She laid down again in the early evening. (Tr. 39-41). She occasionally used a cane, maybe once a month. (Tr. 49).

Plaintiff had COPD and asthma. She used 2 inhalers and a nebulizer. (Tr. 44). She had diabetes, but it was controlled with oral medications. (Tr. 46).

Plaintiff was working part-time as a receptionist at a retirement home. she started there about 8 months before the hearing. She worked 3 to 4 days a week

5

for 3 hours a day. She had tried working an 8-hour day, but it caused too much pain. (Tr. 53-56).

### 3. Relevant Medical Records

Plaintiff was admitted to the hospital following a serious accident with a semi-truck on March 16, 2016. (Tr. 285). Her right hip was broken in 2 places and required an open reduction and internal fixation. (Tr. 374-375).

At the 2-week follow-up visit with the surgeon, she was diagnosed with stitch abscesses and allergic reaction to the surgical staples. (Tr. 524). On April 11, 2016, the surgeon, Dr. McAndrew, performed a debridement and irrigation of the surgical site because of infection. (Tr. 372-373).

Plaintiff returned to the surgeon's office on April 27, 2016 and saw Dr. Canham. She said she "feels great" and was "much improved." X-rays showed the internal fixation hardware in good position. (Tr. 525-526). In June 2016, she was doing "quite well" and was transitioning from a walker to a cane. She was released to return to work for 6 hours a day for 3 to 4 days per week for the next few weeks while she transitioned to full-time employment. She was prescribed physical therapy to work on strengthening, work hardening, endurance, and range of motion. She was to return as needed. (Tr. 527-528).

Plaintiff attended 25 physical therapy sessions between June and October 2016. By July, she felt no pain, had discontinued using her cane, and drove herself to the physical therapy appointment. (Tr. 490). At the next appointment (the tenth session), she reported that she had gone camping the previous weekend and walked in a river for 1.5 to 2 miles. Sometime during that July 2016 weekend,

6

she pulled a muscle in her hip area that was treated with ice packs and she resumed using her cane. (Tr. 491). By the end of August, her pain had improved, and she reported walking up to 2 hours at a time without her cane. (Tr. 501). At the time of discharge from physical therapy in October 2016, plaintiff reported that she was only using her cane while outside of the house as a precautionary measure. (Tr. 512).

Plaintiff saw Dr. Robert Schaefer 3 times between June and September 2016. At each appointment, Dr. Schaefer noted that Plaintiff had an abnormal gait (not bearing weight on her right leg) (Tr. 450-459, 726-727), but her x-rays showed no evidence that her healed hip fracture had become compromised. (Tr. 450-459).

In November 2016, plaintiff had an MRI of her hip, ordered by Dr. Schaefer. The radiologist's findings included a "small right hip joint effusion" and "a mild atrophy and fatty infiltration of the right gluteus muscle." (Tr. 718-19). There is no indication that plaintiff saw Dr. Schaefer again after that MRI was done.

Plaintiff went back to the surgeon's office in March 2017. She reported that she had been doing well until she went on a camping trip about 6 months earlier. She did not have an acute injury on that trip but woke up feeling soreness that had continued. X-rays showed the hardware was in good position. The doctor thought her hip pain and knee pain resulted from deconditioning. She also had a mild component of trochanteric bursitis. He discussed patellar maltracking as a source of her pain and she was to "continue to work on that."[4] The doctor

---

[4] "Patellar tracking disorder (or patellar maltracking) describes movement of your kneecap that isn't aligned, like your kneecap moving sideways. It can usually be relieved with exercises and physical therapy." https://www.healthline.com/health/patellar-tracking-disorder, visited on January 28,

7

recommended home therapy for abductor strengthening, quad strengthening, and patellofemoral PT. (Tr. 531-532). When she returned in May 2017, she was ambulating with a steady gait and required no assistance. She complained of pain in the pelvis, right hip, and right knee. On exam, she had full range of motion of the right knee. She had lateral hip pain with flexion and rotation of the hip and tenderness over the greater trochanter and SI joint. She had tenderness to palpation around the patella. The doctor thought her pain was consistent with patellofemoral pain, patellar maltracking, and trochanteric bursitis. He re-emphasized that she should be doing home therapy exercises and prescribed Meloxicam, a nonsteroidal anti-inflammatory drug. (Tr. 533-535).

In May 2017, plaintiff saw a primary care physician, Dr. Magner, for diabetes and GERD. He noted that she was taking Meloxicam for pain caused by a motor vehicle accident. On exam, he noted no problems with her musculoskeletal system. She was ambulating normally and there was no mention of a cane. He recommended that she not refill her Meloxicam prescription. (Tr.651-653). She returned in June, complaining of a cough and shortness of breath. She was walking with a cane. Dr. Magner referred her to Dr. Jamous for a pulmonology consult. (Tr. 647-650).

Plaintiff went back to the surgeon's office in September 2017. She was waking with a cane and had pain in the right hip and knee. She had not been doing the physical therapy exercises for patellar maltracking. The doctor thought that most of her hip pain was secondary to posttraumatic arthritis. He thought her

2020.

knee pain was a component of patellofemoral maltracking and she was given exercises to do. She wanted to pursue pain management through her primary care physician. (Tr. 538-539).

In October 2017, plaintiff saw Dr. Magner to get a pain management referral. She told him that she had sharp, constant right hip pain from her accident. Her range of motion was not affected but she walked with a limp and used a cane if it was really bad. On exam, her gait was slow and guarded with a limp. He prescribed Tramadol and referred her to pain management. (Tr. 630-633).

Dr. Jamous, a pulmonologist, saw plaintiff in November 2017. He did a full physical exam. She was ambulating normally. She was able to toe walk, heel walk, and tandem gait. She had normal muscle bulk, tone, and strength. Exam of her joints, bones and muscles showed no contractures, malalignment, tenderness, or bony abnormalities, and she had normal movement of all extremities. The doctor ordered a pulmonary function test and counselled her to stop smoking. (Tr. 569-572).

The pulmonary function test showed moderate obstructive ventilatory defect which improves significantly following use of bronchodilators. She had mild restrictive ventilatory defect. She did a 6-minute walk test on room air and did not desaturate below 92%. (Tr. 542-543). The record of the walk test shows that she walked 1500 feet with mild shortness of breath. (Tr. 551).

Plaintiff returned to Dr. Jamous in December 2017. She again was ambulating normally and was able to toe walk, heel walk and tandem gait. (Tr. 565-568).

9

In January 2018, Dr. Magner saw plaintiff for her diabetes. She reported having difficulty taking her afternoon medication on time because of "taking naps and taking care of her nephew." He observed that plaintiff had a normal gait and normal movement of all extremities. She was 5' 3" tall and weighed 271 pounds. (Tr. 614-617).

Plaintiff saw a pain management specialist, Dr. Brummett, in February 2018. On exam, straight leg raising was negative and sensation was intact to both legs. She had some hip pain with rotation. The assessment was right hip arthritis pain versus fibromyalgia. He ordered blood tests and a right hip joint steroid injection. (Tr. 735). In March 2018, plaintiff reported that the injection had given her no relief. She said she continued to have pain in the lateral right hip, aggravated by standing or sitting for long periods of time. She was weightbearing and her gait was steady. On exam, she had no pain in the right hip with external or internal rotation. She had tenderness to palpation in all lumbar muscle groups. Straight leg raising was negative. She had a positive ANA result on blood tests and was to see a rheumatologist in July. The assessment was chronic pain due to lupus. She was to return to Dr. Brummett as needed. (Tr. 834-835).

There are no records of a rheumatology visit.

4.  **State Agency Consultants' Opinions**

In August 2016, a state agency consultant assessed plaintiff's RFC based on a review of the record. He concluded that plaintiff could do light exertion work limited to frequent use (push/pull) with the right leg; occasional climbing of ladders, ropes, and scaffolds; and no exposure to pulmonary irritants. (Tr. 67-69).

10

In November 2016, a second state agency consultant agreed with the first. (Tr. 89-91).

## Analysis

Plaintiff argues that she is limited to less than a full range of sedentary work.

The ALJ found that plaintiff was able to perform her past jobs of cashier (gas station) DOT § 211.462-010, and cashier (checker) DOT § 211.462-014, as those jobs are generally performed. According to the *Dictionary of Occupational Titles*, those jobs are light exertion. Cashier (gas station) does not require any climbing, balancing, kneeling, crouching, or crawling. 1991 WL 671840. Cashier (checker) does not require any climbing, balancing, or crawling, but does require occasional stooping, kneeling, and crouching. 1991 WL 671841

Plaintiff proceeds in a rather scatter-shot fashion, first arguing that the ALJ ignored relevant medical evidence, i.e., the finding of atrophy on the November 2016 MRI, patellar maltracking, and "diagnoses" of fibromyalgia and lupus.

Beginning with the third item, plaintiff greatly overstates the significance of references to fibromyalgia and lupus in the record. She was not diagnosed with fibromyalgia. The pain management specialist considered fibromyalgia as a differential diagnosis but did not ultimately make that diagnosis. And, based on a positive ANA result on a blood test, he referred her to a rheumatologist for further evaluation of possible lupus.

Citing to Tr. 798, plaintiff argues that Dr. Brummett wrote a note on February 22, 2018, which read, "chronic pain panel results today – fibromyalgia-type exam, but patient had an abnormal ANA – homogenous –

11

autoimmune problem causing pain. Refer to rheumatologist to treat for lupus." See, Doc. 20, p. 9. That note was not written by Dr. Brummett; it was written by Brianne Huelsmann, R.N. (Tr. 798). Dr. Brummett did assess chronic pain due to lupus, but in the exam on that date, he found that plaintiff was weightbearing, her gait was steady, and she had no pain in the right hip with external or internal rotation. The only positive physical finding was tenderness to palpation in all lumbar muscle groups. (Tr. 834-835).

After that last visit with Dr. Brummettt, plaintiff was supposed to see a rheumatologist in July 2018, but no records from that appointment (if it occurred) were submitted to the ALJ. Plaintiff was represented by counsel at the agency level and is presumed to have presented her best case for benefits. *Skinner v. Astrue*, 478 F.3d 836, 842 (7th Cir. 2007). Further, the presence or absence of diagnoses of fibromyalgia or lupus does not change the findings of the doctors on exams. Notably, plaintiff claims that she is disabled because of ongoing hip pain following the fracture and internal fixation, but Dr. Brummett found no hip pain on his last visit.

Similarly, plaintiff makes much of the mention of atrophy and patellar maltracking, but points to no medical evidence indicating that they are of such independent significance that they outweigh the relatively benign findings of the doctors in physical exams since November 2017. None of the treating doctors even mentioned atrophy.

Plaintiff takes issue with the ALJ's statement that "Physical examination findings since November 2017 have been essentially unremarkable." (Tr. 20).

Her argument is undermined by her selective highlighting of rather minimal findings while ignoring the fact that Dr. Jamous and the pain management specialist found no hip pain. Plaintiff testified that she cannot work because of hip pain; surely the absence of hip pain and a finding of normal gait on physical exams is highly relevant to that claim.

Plaintiff argues that the ALJ erred in relying on the state agency consultants' opinions because they were outdated. She argues that they did not review the November 2016 MRI or later treatment notes. The ALJ did say that he gave "significant weight" to those opinions, but he also assessed additional postural limitations beyond those assessed by the consultants. Therefore, it is difficult to see how the ALJ's statement that he gave "significant weight" to those opinions harmed plaintiff. In any event, plaintiff points to no medical evidence to establish that the later evidence is significant enough that it would have changed the consultants' opinions. See, *Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018); *Lambert v. Berryhill*, 896 F.3d 768, 776 (7th Cir. 2018).

Lastly, in an undeveloped argument, plaintiff suggests that the ALJ erred by not considering whether she was entitled to a closed period of disability. See, Doc. 20, p. 8. However, there is no reason to think that the ALJ failed to consider that issue. He referred to the 12-month durational requirement and stated that plaintiff "has not been under a disability within the meaning of the Social Security Act" since the alleged onset date. (Tr. 13).

The record substantially supports the ALJ's conclusion that, while plaintiff suffered a serious injury, she recovered well enough to return to work. Plaintiff's

arguments are little more than an invitation for this Court to reweigh the evidence. Even if reasonable minds could differ as to whether plaintiff was disabled at the relevant time, the ALJ's decision must be affirmed if it is supported by substantial evidence, and the Court cannot substitute its judgment for that of the ALJ in reviewing for substantial evidence. *Burmester,* 920 F.3d at 510; *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012).

## Conclusion

After careful review of the record as a whole, the Court is convinced that the ALJ committed no errors of law, and that his findings are supported by substantial evidence. Accordingly, the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits is **AFFIRMED**.

The Clerk of Court is directed to enter judgment in favor of defendant.

**IT IS SO ORDERED.**

**DATE:** February 20, 2020.

**DONALD G. WILKERSON**
**U.S. MAGISTRATE JUDGE**